## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **CHARLES GRAHAM,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | |
| **JO ANNE B. BARNHART,** | § | **SA-05-CA-0848 XR (NN)** |
| **Commissioner of the Social** | § | |
| **Security Administration,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:   **Hon. Xavier Rodriguez**
         **United States District Judge**

## I. <u>Introduction</u>

Plaintiff Charles Graham seeks review and reversal of the administrative denial of his

application for Supplemental Security Income (SSI) by the Administrative Law Judge (ALJ).

Graham contends that the ALJ erred by determining that his depression is not a severe

impairment and by failing to obtain vocational expert testimony.  Graham maintains that the ALJ

made errors of law that require the Court to reverse the decision of the defendant, the

Commissioner of the Social Security Administration (SSA), denying him benefits.  Graham asks

the Court reverse the decision and to render judgment in his favor.  In the alternative, Graham

asks the Court to reverse the decision and remand the case for further factual development.

After considering Graham's brief in support of his complaint,[1] the brief in support of the

---

[1] Docket entry # 14.

Commissioner's decision,[2] Graham's reply brief,[3] the record of the SSA proceedings, the pleadings on file, the applicable case authority and relevant statutory and regulatory provisions, and the entire record in this matter, I recommend affirming the Commissioner's decision.

I have jurisdiction to enter this Memorandum and Recommendation under 28 U.S.C. § 636(b) and this district's general order, dated July 17, 1981, referring all cases where a plaintiff seeks review of the Commissioner's denial of the plaintiff applications for benefits for disposition by recommendation.[4]

## II. Jurisdiction

The District Court has jurisdiction to review the Commissioner's final decision as provided by 42 U.S.C. §§ 405(g), 1383(c)(3).

## III. Administrative Proceedings

Based on the record in this case, Graham fully exhausted his administrative remedies prior to filing this action in federal court. Graham filed for SSI benefits on February 19, 2003, alleging disability beginning May 1, 2002. The Commissioner denied the application initially and on reconsideration. Graham then asked for a hearing. A hearing was held before the ALJ on March 4, 2004. The ALJ issued a decision on April 28, 2004, concluding that Graham is not disabled within the meaning of the Social Security Act (the Act). Graham's attorney, William Reeves, asked for review of the decision on June 24, 2004. The SSA Appeals Council concluded on July 28, 2005 that no basis existed for review of the ALJ's decision. The ALJ's decision

---

[2]Docket entry # 15.

[3]Docket entry # 16.

[4]*See* Local Rules for the Western District of Texas, appx. C, p. 10.

became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g). Graham filed this action seeking review of the Commissioner's decision on September 12, 2005.[5]

**IV.  Issue Presented**

> Is the ALJ's decision that Graham was not under a "disability," as defined by the Act, at any time through the date of the decision, supported by substantial evidence and does the decision comport with relevant legal standards?

## V.  Analysis

**A. Standard of Review**

In reviewing the Commissioner's decision denying disability benefits, the reviewing court is limited to determining whether substantial evidence supports the decision and whether the Commissioner applied the proper legal standards in evaluating the evidence.[6]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[7]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[8]

If the Commissioner's findings are supported by substantial evidence, then they are

---

[5]*See* Graham's complaint, docket entry # 3.

[6]*Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995); 42 U.S.C. §§ 405(g), 1383(c)(3).

[7]*Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[8]*Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988) (quoting *Hames*, 707 F.2d at 164).

conclusive and must be affirmed.[9]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner.[10]  Conflicts in the evidence and credibility assessments are for the Commissioner and not for the courts to resolve.[11]  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[12]

### 1. Entitlement to Benefits

Every individual who meets certain income and resource requirements, has filed an application for benefits, and is under a disability, is eligible to receive SSI benefits.[13]  The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[14]  A claimant shall be determined to be disabled only if his or her physical

---

[9]*Martinez*, 64 F.3d at 173.

[10]*Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see also Villa*, 895 F.2d at 1021 (The court is not to reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.).

[11]*Martinez*, 64 F.3d at 174.

[12]*Id.*

[13]42 U.S.C. § 1382(a)(1) & (2).

[14]42 U.S.C. § 1382c(a)(3)(A).

or mental impairment or impairments are so severe that he or she is unable to not only do his or her previous work, but cannot, considering his or her age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he or she applied for work.[15]

### 2. Evaluation Process and Burden of Proof

Regulations set forth by the Commissioner prescribe that disability claims are to be evaluated according to a five-step process.[16]  A finding that a claimant is disabled or not disabled at any point in the process is conclusive and terminates the Commissioner's analysis.[17]

The first step involves determining whether the claimant is currently engaged in substantial gainful activity.[18]  If so, the claimant will be found not disabled regardless of her medical condition or her age, education, or work experience.[19]  The second step involves determining whether the claimant's impairment is severe.[20]  If it is not severe, the claimant is deemed not disabled.[21]  In the third step, the Commissioner compares the severe impairment with

---

[15]42 U.S.C. § 1382c(a)(3)(B).

[16]20 C.F.R. §§ 404.1520 and 416.920.

[17]*Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

[18]20 C.F.R. §§ 404.1520 and 416.920.

[19]*Id.*

[20]*Id.*

[21]*Id.*

5

those on a list of specific impairments.[22]  If it meets or equals a listed impairment, the claimant is

deemed disabled without considering his or her age, education, or work experience.[23]  If the

impairment is not on the list, the Commissioner, in the fourth step, reviews the claimant's

residual functional capacity and the demands of his or her past work.[24]  If the claimant is still able

to do his or her past work, the claimant is not disabled.[25]  If the claimant cannot perform his or

her past work, the Commissioner moves to the fifth and final step of evaluating the claimant's

ability, given his or her residual capacities, age, education, and work experience, to do other

work.[26]  If the claimant cannot do other work, he or she will be found disabled.  The claimant

bears the burden of proof at the first four steps of the sequential analysis.[27]  Once the claimant

has shown that he or she is unable to perform his or her previous work, the burden shifts to the

Commissioner to show that there is other substantial gainful employment available that the

claimant is not only physically able to perform, but also, taking into account her exertional and

nonexertional limitations, able to maintain for a significant period of time.[28]  If the Commissioner

adequately points to potential alternative employment, the burden shifts back to the claimant to

---

[22]*Id.*

[23]*Id.*

[24]*Id.*

[25]*Id.*

[26]*Id.*

[27]*Leggett*, 67 F.3d at 564.

[28]*Watson  v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002).

prove that he or she is unable to perform the alternative work.[29]

## B. Findings and Conclusions of the ALJ

In the instant case, the ALJ reached his decision at step five of the evaluation process.  At step one, the ALJ determined that Graham had not engaged in substantial gainful activity since his alleged onset date.  At step two, the ALJ determined that Graham "has medically determinable impairments due to diabetes mellitus, chronic pancreatitis, and the residual effects of a left ankle fracture status post surgical arthrodesis, which are severe, and due to depression and anxiety, which are not severe, considered separately or in combination with any other impairments."  At step three, the ALJ found that the "severity of [Graham's] impairments, considered either singly or in combination, does not meet or equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  At step four, the ALJ found that Graham "does not have the residual functional capacity to return to his past work as a carpenter" and "retains the residual functional capacity to perform a full range of sedentary exertional level work."  At step five, the ALJ determined that Graham "can perform the demands of the full range of sedentary work" and concluded that Graham is not disabled as defined in the Social Security Act.

## C.  Graham's Allegations of Error

Graham claims that the ALJ erred in determining that he was not under a disability as defined by the Act through the date of the decision and therefore, not eligible for SSI benefits.  In particular, Graham contends that the ALJ erred by (1) finding that his depression was not a severe impairment, and (2) failing to obtain vocational expert testimony.

### 1. Is the ALJ's finding that Graham's depression is not a severe impairment

---

[29]*Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).

**supported by substantial evidence?**

Graham maintains that his depression constitutes a severe impairment.  He relies on a doctor's diagnosis that he suffers from recurrent major depressive disorder, "severe without psychotic features."  Graham complains that the ALJ failed to explain how his daily activities make him able to perform the daily requirements of a job and that the ALJ failed to explore the pace and exertion levels of a job.  He asserts that he has met the standards set out in *Stone v. Heckler*[30] for showing that his impairment is severe.

Under the SSA regulations, an impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."[31]  In *Stone*, the Fifth Circuit explained that an "'impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'"[32]  The SSA measures "severity according to the functional limitations imposed by . . . [the] mental impairment."[33]  In determining whether the claimant has functional limitations, the SSA considers: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.[34]  In this case, substantial evidence supports the ALJ's determination that Graham's depression is not a severe impairment.

---

[30]752 F.2d 1099 (5th Cir. 1985).

[31]20 C.F.R. § 404.1520 (c).

[32]*Stone*, 752 F.2d at 1101 (citation omitted).

[33]20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 (2003).

[34]*Id*.

The record contains a diagnosis of "Major Depressive Disorder - Severe Without Psychotic Features," but otherwise contains no evidence that Graham's depression significantly limits his physical or mental ability to do basic work activities.  The diagnosis that serves as the basis of Graham's argument was provided by Bradford I. Brunson, Ph.D.  Dr. Brunson is a licensed psychologist who evaluated Graham on November 5, 2002.  In his report,[35] Dr. Brunson diagnosed Graham as having "Major Depressive Disorder - Severe Without Psychotic Features."[36]  Dr. Brunson's report,[37] however, contains nothing that indicates the diagnosis significantly limits Graham's physical or mental ability to do basic work activities.  Although Graham argues that the diagnosis constitutes substantial evidence that his depression is a severe impairment, Dr. Brunson's report does not support this assertion.

In the report, Dr. Brunson  described Graham's thought processes as "logical and coherent."  In describing Graham's cognitive processes, Dr. Brunson reported that Graham's "attention and concentration skills were mildly impaired," and that Graham was "oriented for person, place, and time."  Dr. Brunson also reported that Graham's "[i]mmediate, recent, and remote memory responses were intact."  He further reported that "[t]here was no indication of notable decline of intellectual ability."  Dr. Brunson opined that Graham's computational skills were "within normal limits" and that there was "no obvious evidence of . . . cognitive deficits typically associated with brain dysfunction."  He stated that Graham's "[i]nsight into his own psychological functioning and adjustment appears to be good," and that "[j]udgment with regard

---

[35]*See* SSA record, pp. 395-401.

[36]The diagnosis constitutes a single line in a 500-page record.

[37]SSA record, pp. 396-401.

to decisions affecting his own well-being is good."  Dr. Brunson opined that "[t]here are no indications that Mr. Graham is not competent to manage his own affairs."  He characterized Graham's prognosis as "guarded [due to medical problems]."  He stated that "[t]here do not appear to be any difficulties or problems in 'Activities of Daily Living'."  Dr. Brunson reported that Graham indicated that he handles his own business and social affairs, he moves about the city with generally no difficulty, he assumes responsibility for his own household chores and tasks, and he has no difficulty tending to personal hygiene.

These opinions do not indicate that Graham's depression significantly limits him in work activities.  Indeed, Dr. Brunson advanced no opinions regarding work activities.  Nothing in Dr. Brunson's report indicates that depression limits Graham's activities of daily living; social functioning; or concentration, persistence, or pace; or that it has resulted in episodes of decompensation.  Consequently, the report does not show that depression has more than a minimal effect on Graham or that depression interferes with Graham's ability to work.  As a result, Dr. Brunson's report supports the ALJ's determination that Graham's depression is not severe.

Other evidence supports the ALJ's determination.  In particular, Graham's testimony[38] during the hearing before the ALJ supports the determination.  During the hearing, Graham described how his various medical problems prevented him from working in his former occupation as a carpenter.  The testimony establishes that Graham is no longer able to work as a carpenter due to diabetes mellitus, chronic pancreatitis, and the residual effects of a left ankle fracture status post surgical arthrodesis, all of which the ALJ determined are severe impairments.

---

[38]*Id*. at pp. 29-47.

10

But Graham's testimony does not indicate that his depression prevents him from working or significantly impairs his daily activities.  When questioned by his attorney about his depression, Graham testified "they first diagnosed me with depression" in November 1998 and stated that he was "getting counseling for that, and that [he was] on medication for that."[39]  When his attorney asked about the effect of the counseling and medication, Graham testified, "It helps quite a bit but it has not eliminated the problem."[40]  Graham testified that he received counseling for his depression, "once every two weeks to a month."[41]  Graham did indicate, however, that his depression affects his appetite.  When asked if his depression affected his appetite, Graham answered, "Between that and the pancreatitis, I have no appetite."  Graham then continued to describe how his pancreatitis caused him to have chronic diarrhea, requiring frequent restroom breaks during the day and diapers at night.  Other than problems with appetite, Graham did not attribute any of his difficulties to depression.  He did not indicate that his depression had any impact on his daily living; his social functioning; or his concentration, persistence, or pace.  He did not testify that his depression had resulted in episodes of decompensation.  Consequently, Graham's testimony supports the ALJ's determination that Graham's depression is not a severe impairment.

In addition to Dr. Brunson's report and Graham's testimony, Graham's medical records from the Fairfax-Falls Church Mental Health Services[42] supports the ALJ's determination that

---

[39]*Id*. at p. 41.

[40]*Id*.

[41]*Id*. at p. 45.

[42]*Id*. at pp. 344-82.

Graham's depression is not a severe impairment.  Those records document counseling during the time period November 28, 2001 to August 13, 2002.  The clinical evaluation in those records, dated November 28, 2001,[43] states that Graham was self-referred for treatment and that he was concerned about feelings of depression.  The therapist who prepared the evaluation, reported that Graham indicated that he was "having a difficult time getting motivated to do his work" and that he "describe[d] periods where he can isolate and can sometimes not leave his house for several days."  Graham also described problems with sleeping.  At that time, the therapist diagnosed Graham as having "Major Depressive Disorder, Recurrent, Moderate Severity."  According to the therapist's intake notes, Graham explained that he had previously taken Prozac for depression and that he wanted to see a psychiatrist to discuss the use of anti-depressants.[44]  The remainder of the record is comprised of the therapist's notes of future counseling sessions and documentation of Graham's visits with a psychiatrist to obtain medications.  The record indicates that Graham saw a psychiatrist on December 17, 2001 and reported that he was sleeping only two or three hours per night and had no appetite.[45]  The psychiatrist diagnosed Graham as having "Major Depression - Recurrent" with a history of alcoholism that stopped on July 4, 1992.[46]  The psychiatrist prescribed Trazadone and Paxil—drugs used for treating depression.  A note by the therapist, dated December 18, 2001, indicates that the Trazadone was helping Graham sleep.[47]

---

[43]*Id*. at p. 377.

[44]*Id*. at p. 375.

[45]*Id*. at p. 369.

[46]*Id*. at p. 368.

[47]*Id*. at p. 366.

The record shows that the psychiatrist increased the prescribed amount of both prescribed drugs on January 8, 2002.[48]  The record reflects that Graham met with the therapist on January 7, 2002, and reported that he was doing okay and felt less depressed.[49]  The therapist's notes for that visit indicate that Graham stated that his motivation had been good.  On January 17, 2002, the psychiatrist reported that Graham felt the medications were effective and that he was doing well.[50]  On February 28, 2002, the psychiatrist made a record entry that Graham "[s]eem[ed] to be doing well on present medications" and that Graham indicated that he had trouble getting refills of his medication because he has been working out-of-town.[51]  By March 7, 2002, the therapist reported that Graham's mood was stable and that his depression had decreased.[52]  The following week, Graham reported to the therapist that he was feeling okay.[53]  On March 20, 2002, the therapist reported that Graham said he was feeling okay and he planned to move to California.[54]  He denied feelings of depression.  On April 25, 2002, Graham reported that he was feeling okay and he told his therapist that he planned to move by August 1.[55]  On May 3, 2002,

---

[48]*Id*. at p. 367.

[49]*Id*. at p. 363.

[50]*Id*. at p. 365.

[51]*Id*. at p. 366.

[52]*Id*. at p. 364.

[53]*Id*.

[54]*Id*. at p. 361.

[55]*Id*. at p. 362.

Graham reported improved mood and motivation.[56]  On May 9, 2002, Graham reported that he

had had a lot of work and the work had helped improve his mood.[57]  Graham stated that he was

taking his medications and experienced no side effects.  On June 11, 2002, Graham reported to

the therapist that he had applied for welfare benefits and reported feeling humiliated and

depressed.[58]  Graham saw the psychiatrist again on June 14, 2002.[59]  At that time, he reported that

he had experienced a knee injury.  He explained that he had been unable to eat because of his

pancreatitis and been unable to work.  He stated that he was emotionally stable on the

medication.  On June 21, 2002, Graham reported being behind on all of his bills and having been

approved for temporary disability benefits.[60]  Graham stated that he felt embarrassed and

frustrated to be in his predicament.[61]  On July 3, 2002, Graham told the therapist that he planned

to move to Texas by the end of July to care for his father.[62]  Graham contacted the therapist on

August 7, 2002, and indicated that he had been hospitalized for couple of weeks and that he

would like to see the psychiatrist to renew his prescriptions.  Graham visited the clinic on August

9, 2002 to pick up his prescriptions, but left abruptly when his ride could no longer wait for

---

[56]*Id*. at p. 359.

[57]*Id*. at p. 359.

[58]*Id*. at p. 360.

[59]*Id*. at p. 357.

[60]*Id*. at p. 360.

[61]*Id*.

[62]*Id*. at p. 355.

14

him.[63]  The final note in Graham's record is dated August 13, 2002.[64]  The note indicates that

Graham called to apologize about his behavior on August 9, 2002, and stated that he hoped to

pick up his medications on August 14 or 15 if he could obtain a ride.

Nothing in the Graham's record from Fairfax-Falls Church Mental Health Services

indicates that his depression significantly limited Graham's physical or mental ability to do basic

work activities.  Nothing indicates that depression limited Graham in activities of daily living;

social functioning; or concentration, persistence, or pace.  Nothing suggests depression caused an

episode of decompensation.  Instead, the record suggests that working helped Graham manage

his depression because he was able to produce income to pay his bills, but his medical problems

oftentimes prevented him from working.  Thus, Graham's records from Fairfax-Falls Church

Mental Health Services supports the ALJ's determination that Graham's depression is a not a

severe impairment.

Medical records from the Center for Health Care Services also supports the ALJ's

determination.  A Physician's Progress Note, dated October 7, 2002,[65] is somewhat difficult to

read, but appears to document Graham's first visit after moving to Texas and that Graham sought

a prescription for his psychiatric medications.  In the note, a physician wrote that Graham

reported mild depression and good results from Pazil and Trazadone.  The physician assessed

Graham's depression as a "4" on a scale of "0 to 10," with "10" indicating extreme depression

and "5" indicating moderate depression.  The physician assessed Graham's mood as mildly

---

[63]*Id*. at p. 345.

[64]*Id*.

[65]*Id*. at pp. 454-58.

depressed, his affect as depressed, and his thought content and process as appropriate and goal directed.  The physician indicated that Graham had no gross cognitive deficits.  The physician prescribed the same medications as Graham had obtained from Fairfax-Falls Church Mental Health Services.  In a Physician's Abbreviated Progress Note, dated December 10, 2002,[66] a different physician wrote that Graham reported problems with sleeping, and increased Graham's dosage of Trazadone.  The physician also wrote that Graham was "pretty upset" because the SSA had denied him disability benefits.  In another physician's note, dated January 7, 2003,[67] another physician assessed Graham's depression as "1" and his insomnia as "2."  The physician also assessed Graham's mood as euthymic, his affect as appropriate, his thought content and process as goal directed, and indicated Graham had no gross cognitive deficits.  That physician renewed Graham's prescription for medications at the increased dosage.  In a Physician's Progress Note, dated February 6, 2003,[68] a physician assessed Graham's depression as "7" and his insomnia as "2-3."  The physician assessed Graham's thought content and process as appropriate and his mood as depressed.  The physician noted no gross cognitive defects.  In another note, dated March 10, 2003,[69] a physician assessed Graham's depression as "1-2," his mood as "1-2," his anxiety as "1-2," and his mood as euthymic.  Nothing in these records indicates that depression has more than a minimal effect on Graham or that depression interferes with Graham's ability to work.  As a result, the records support the ALJ's determination.

---

[66]*Id*. at pp. 451-52.

[67]*Id*. at pp. 445-49.

[68]*Id*. at pp. 438-48.

[69]*Id*. at pp. 434-37.

Finally, Dr. Robert M. Gilliland of University Health System indicated in a Psychiatric Review Technique, dated July 16, 2003,[70] that Graham had a medically determinable impairment that does not precisely satisfy the diagnostic criteria—major depression—and that Graham's impairment was not severe.  He also indicated that Graham experienced mild anxiety.  Dr. Gilliland's evaluation indicated that Graham had no restriction of activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation, each of extended duration.  The doctor opined that Graham's alleged limitations are not fully supported by medical and other evidence.  This evidence supports the ALJ's determination because it does not indicate that Graham's depression significantly limits his physical or mental ability to do basic work activities.

Viewed as a whole, the record indicates that Graham has significant medical problems, but it does not indicate that his depression is so severe as to affect his work activities.  Instead, the record indicates that Graham's medical problems have rendered him unable to work in his former occupation.  The inability to work in the same manner as before has prevented him from producing the income he needs to support himself and to pay for the medical services he needs.  The record does not, however, indicate that Graham's depression has impacted his ability to work.  Instead, the therapist's notes indicates that working helped Graham manage his depression.  Based on the evidence in the record, I conclude that substantial evidence supports the ALJ's decision that Graham's depression is not a severe impairment.

**2. Did the ALJ err by failing to obtain vocational expert testimony?**

Graham next maintains that the ALJ erred by failing to consult a vocational expert

---

[70]*Id.* at pp. 486-99.

because he suffers from significant nonexertional limitations—*i.e.*, depression and chronic

diarrhea.  Graham argues that the ALJ failed to account for these limitations, and that as a result,

the ALJ erred by failing to obtain vocational expert testimony and mechanically applying the grid

rules.

> When the characteristics of the claimant correspond to criteria in the
> Medical-Vocational Guidelines of the regulations [the grid rules] and the claimant
> either suffers only from exertional impairments or his non-exertional impairments
> do not significantly affect his residual functional capacity, the ALJ may rely
> exclusively on the [grid rules] in determining whether there is other work
> available that the claimant can perform.  Otherwise, the ALJ must rely upon
> expert vocational testimony or other similar evidence to establish that such jobs
> exist.[71]

Under this guidance, the ALJ was required to consult a vocational expert if Graham's

nonexertional impairments significantly affect his residual functional capacity.

The ALJ's opinion does not contain an explicit determination about the significance of

Graham's nonexertional impairments.  Instead, the ALJ's decision reflects an implicit

determination that Graham's nonexertional impairments are not significant.  This implicit

determination is evidenced by the ALJ's reliance on the grid rules and by his statement during

Graham's hearing, "I don't believe I have any questions for the vocational expert in this case."[72]

Substantial evidence supports this implicit determination.  Because the effect of Graham's

depression is discussed in detail above, the following discussion focuses on the effect of

---

[71]*Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[72]SSA record, p. 46.  In addition, the ALJ observed in his opinion that Graham testified that he
had chronic diarrhea, occurring about 3 times on a good day and 10 times on a bad day.  The ALJ
further observed that the condition had been present since 1992, but that it had not prevented Graham
from working at substantial gainful activity as a carpenter.  This finding indicates that the ALJ found
no evidence indicating that Graham's diarrhea affected his ability to work.

Graham's chronic diarrhea.

Previously, the Fifth Circuit recognized diarrhea as a nonexertional limitation.  In

*McDaniel v. Harris*,[73] the Fifth Circuit rejected the Commissioner's determination that the

claimant could perform sedentary work where the claimant's doctor described the claimant's

diarrhea as follows:

> [The claimant] has had intermittent diarrhea ever since the injury, requires
> medication when it is present, and it is a very urgent diarrhea when present and he
> will be relegated to taking medications in all medical probability for the control of
> this diarrhea from now on.
>
> This man is totally incapable of doing any type of manual labor and will not be
> able to do so any time in the future. Since both sitting and standing are painful for
> him, if it continues for any lengthy period of time, and since he has a diarrhea of
> rather explosive nature, it is going to be a problem to train him in any type of
> sedentary work that requires him to be hired out to someone else.[74]

Based on this evidence, the Fifth Circuit reversed the Commissioner's determination that the

claimant was not disabled and directed the Commissioner to award disability benefits.

Although diarrhea may significantly affect a claimant's ability to work, the record in this

case simply does not contain evidence indicating that Graham's diarrhea affects his ability to

work.  The evidence about diarrhea is summarized below.

Some evidence about diarrhea is contained in the transcript of Graham's hearing.  The

following exchange occurred between Graham and his attorney:

> The attorney:   . . . Now I see in the record that you also had chronic diarrhea.  Do
>                 you still have that –
>
> Graham:         Yes, I do.  And that's because of the pancreatitis.  When they do

---

[73]639 F.2d 1386 (5th Cir. 1981).

[74]*McDaniel*, 639 F.2d at 1390.

the iliac [phonetic] pain block in my back they kill all the sympathetic nerves to that, and that's just one of the side effects of that.

The attorney:  So do you have to use the restroom quite a bit during the day?

Graham:      Yes.

The attorney:  How often do you go whenever you have a bad day?

Graham:      Yesterday probably was 10 times.

The attorney:  How about a good day?

Graham:       A good day about three.  And a lot of this diarrhea happens at night, so I'm forced to wear diapers now.  And I'm waiting on this pain block to totally wear off.[75]

Later, the ALJ questioned Graham about the diarrhea.  The following exchange occurred.

ALJ:          . . . How often do you have the bad days with the diarrhea?

Graham:      During the day, probably twice a week.

ALJ:          Mostly it's at night?

Graham:      Yes, sir.[76]

Graham did not elaborate on how the diarrhea prevented him from working.  Instead, he simply testified that he has intermittent bouts of diarrhea.  This evidence supports the ALJ's determination because Graham did not indicate how his intermittent bouts of diarrhea affected his ability to work.  Graham's testimony also supports the determination because Graham suggested the diarrhea will stop once the effects of the pain block wears off.

There is a minimal amount of evidence about Graham's diarrhea in medical records from

---

[75]SSA record, pp. 41-42.

[76]*Id*. at p. 45.

Riverside Tappahannock Hospital.  In a consultation report, dated November 23, 1998,[77] Dr. William Whitfield wrote that Graham was seen at the emergency room, complaining—amongst other symptoms—about abdominal pain.  After assessing Graham's medical problems and history, Dr. Whitfield concluded that Graham was a satisfactory candidate for a gastroscopy.  Dr. Whitfield made no observation about diarrhea, except to note that Graham reported that "his normal bowel habit is 1-2 formed stools daily."  The following day, Dr. Whitfield reported that Graham "had a minimal bowel movement last night and is starting to eat applesauce today."[78]

On December 1, 1998, Dr. Whitfield reported that Graham was "eating solid food . . . and he has had bowel movements." [79]  On December 15, 1998, in a letter to Dr. Vikas Gupta, Riverside Physician Associates,[80] Dr. Whitfield stated that Graham had been released from the hospital and that he felt generally well except for his persistent abdominal pain.  He wrote that Graham had "been eating quite well and denied vomiting or diarrhea," and that he was requesting something for abdominal pain.  The record shows that Dr. Whitfield performed an endoscopic retrograde cholangio-pancreatography on January 26, 1999.[81]  In another letter to Dr. Gupta, dated January 28, 1999,[82] Dr. Whitfield wrote that Graham had the classic findings of chronic pancreatitis with pancreatic insufficiency and that it did not appear that a repeat celiac access ganglion block

---

[77]*Id*. at pp. 188-92.

[78]*Id*. at p. 187.

[79]*Id*. at p. 186.  Page 2 of the report is not included in the record.

[80]*Id*. at p. 182.

[81]*Id*. at p. 177-79.

[82]*Id*. at p. 1775-76.

would be helpful.  He did not mention any problems with diarrhea.  Dr. Whitifield wrote Dr.

Gupta again on May 12, 1999, and reported that Graham's bowel habit "is 1 stool q. 2-3 days."[83]

He did not comment on any problems with diarrhea.  On June 16, 1999, however, Dr. Whitfield

wrote that Graham's diarrhea had worsened and that his stools appeared more oily.[84]  Dr.

Whitfield opined that Graham's "diarrhea suggests the possibility of pancreatic insufficiency"

and he recommended pancreatic supplements.  On July 20, 1999, Dr. Whitfield reported to Dr.

Gupta that Graham's "diarrhea symptoms have improved by taking a higher dose of pancreatic

supplement."  Dr. Whitfield saw Graham on September 20, 1999, and observed that Graham's

bowel habits remained fairly regular.[85]  On October 13, 1999, Dr. Whitfield reported to Dr. Gupta

that Graham had a CT scan of his abdomen and his pelvis.  He stated that Graham's stools were

dark, but Graham had been taking Pepto-Bismol.  The final entry in this series of treatment notes

is an office note, dated April 27, 2000.  In the note, Dr. Whitfield indicated that Graham had

"some increasing abdominal pain and worsening diarrhea and he [Graham] thinks this is partly

related to 'stress.'"[86]  At that time, Dr. Whitfield recommended that Graham "take a little

Imodium (although the oxycodone is obviously a constipating agent)."[87]  This evidence supports

the ALJ's determination because although it reflects intermittent bouts with diarrhea, it does not

indicate that diarrhea limited Graham's ability to work.

---

[83]*Id*. at p. 171.

[84]*Id*. at p. 170.

[85]*Id*. at p. 167.

[86]*Id*. at p. 160.

[87]*Id*.

Graham's medical records from Inova Alexandria Hospital[88] contain little in regard to Graham's problems with diarrhea.  On November 1, 2001, Graham underwent a colonoscopy at Inova Alexandria Hospital to rule out colitis.[89]  Graham's pre-operative diagnosis was diarrhea. The assessment of the procedure reads: "blunting of the vascular pattern in the left colon, rule out colitis otherwise, normal colonoscopy."  Labrotory results from the colonoscopy indicated "non-specific chronic colitis."[90]  Emergency department nursing notes, dated May 20, 2002,[91] indicate that Graham had no diarrhea.[92]  Dr. Ronald Barkin's consultation notes, dated May 21, 2002,[93] indicate that Graham had been seen at the emergency room, complaining about nausea, vomiting, hematuria, and flank pain.  In the notes, Dr. Barkin stated that Graham reported "dark stools." Dr. Barkin made no observation in regard to diarrhea.  Graham was discharged from Inova Alexandria Hospital on June 4, 2002.[94]  This evidence supports the ALJ's determination because it does not reflect limitations on Graham's ability to work.

Although the record contains some evidence about diarrhea, the evidence takes the form of symptoms of Graham's problems with pancreatitis, without indicating limitations imposed by diarrhea.  The record does not contain a diagnosis of chronic diarrhea.  No evidence exists of the

---

[88]*Id*. at pp. 210-342.

[89]*Id*. at pp. 210-11.

[90]*Id*. at p. 213.

[91]*Id*. at pp. 266-73.

[92]*Id*. at p. 271.

[93]*Id*. at pp.254-55.

[94]*Id*. at p. 218-20.

type determined in *McDaniel* to support a determination of disability or to demonstrate a significant limitation.  Without evidence that diarrhea significantly impacts Graham's residual functional capacity, the ALJ properly applied the grid rules.

The same applies to evidence of Graham's depression.  While more evidence exists about Graham's depression, no evidence indicates that depression significantly limits Graham's physical or mental ability to do basic work activities.  Without evidence that depression significantly impacts Graham's residual functional capacity, the ALJ properly applied the grid rules.  Consequently, I conclude that the ALJ did not err in failing to consult a vocational expert.

## VI.  <u>Recommendation</u>

Based on the foregoing, I recommend that Graham's request for relief (docket entry # 3) be **<u>DENIED</u>** and that the decision of the Commissioner be **<u>AFFIRMED</u>**.

## VII. <u>Instructions for Service and Notice of Right to Object/Appeal</u>

The United States District Clerk shall serve a copy of this Memorandum and Recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "Filing User" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this Memorandum and Recommendation must be filed within 10 days after being served with a copy of same, unless this time period is modified by the District Court.[95]  **Such party shall file the objections with the Clerk of the Court, and serve the objections on all other parties and the Magistrate Judge.**  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the

---

[95] 28 U.S.C. §636(b)(1); FED. R. CIV. P. 72(b).

District Court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the District Court.[96]  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this Memorandum and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.[97]

**SIGNED** on January 22, 2007.

*Nancy Stein Nowak*

NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE

---

[96] *Thomas v. Arn*, 474 U.S. 140, 149-152 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).

[97] *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).